NewJerseyStaffingAlliance,etalv. Mr. Sinens. May it please the Court, Ruben Sinens on behalf of NewJerseyStaffingAlliance, the American Staffing Association, and the NewJersey Business and Industry Association. I'd like to reserve three minutes for rebuttal. Granted. Thank you, Your Honor. Your Honor, Your Honors. We are unaware of any statute in the entire country, ever, which has sought to impose an entire regulatory scheme, particularly with regard to wages in the private industry, that is binding upon transactions out of state, that is binding upon customers out of state, that is binding on individuals out of state. We are at a loss. We believe that the statute at issue here is very much akin to, frankly, maybe more egregious than the pricing statutes, which the Supreme Court of the United States has struck down. Usually pricing statutes have some element of discrimination here. The New Jersey law would apply in state New Jersey and to New Jersey staffing agencies that place people out of state. So where is the discrimination? Respectfully, Judge Ambrose, there is discrimination here because the statute, by definition, prefers New Jersey employees over Pennsylvania employees, and indeed requires that New Jersey residents be your Pennsylvania employees are not your clients, right? That is correct. The Pennsylvania employees are not our clients. However, we represent Nor are the New Jersey employees. That is correct. And clearly the legislation is intended, it's expressly intended to privilege the employees, correct? It is intended to privilege the employees. That being said, it has adverse impact upon our clients. Sure. The district court so found. District court found irreparable harm. It's devastating to your clients. It might put them out of business. Maybe it's really bad legislation. But what does that have to say about the Dormant Commerce Clause? Your Honor, if I give an example here, according to both the legislation and more particularly the proposed regulations, this law applies to the following situation. A Pennsylvania staffing company, which does business in New Jersey, has a contract with a Pennsylvania manufacturing company, third-party client. They send temporary workers, one New Jersey temporary worker. Well, they'd be foolish to do that after this legislation. Pennsylvania staffing companies shouldn't be hiring any temporary workers from New Jersey. This requires at the point of contact a staffing calculation, and you staff it accordingly so you don't have a problem. But by very definition, as your honors have just indicated, this statute places the barrier upon the free market, the unitary market for wages between the states. I agree it would be foolish and it imposes a terrible burden, but to answer Judge Ambrose's question earlier, how is it discriminatory? New Jersey employees are required to be paid an average more than Pennsylvania employees. Which is why the Pennsylvania staffing company will hire temp workers from Pennsylvania, not New Jersey. Exactly. Which is why Pennsylvania may enact retaliatory legislation to say we don't agree that New Jersey workers are worth more. We believe Pennsylvania workers are worth more. So if you want to send a Pennsylvania worker somewhere, whether it's in Pennsylvania or New Jersey or Arkansas, you must pay a Pennsylvania worker more. That is discriminatory. Judge Becker used to say that's the next case. It's this precise case, Judge Ambrose, because in this particular situation, in this particular situation, there is no room for negotiation. There is no room for negotiation. There was a lot of negotiation because apparently the governor decided to favor certain businesses and exempt them from this onerous law, and your clients apparently weren't looked on as favorably by the governor as some of these other industries that were exempted from the law. Respectfully, Judge Hardiman, I'm not talking about that type of negotiation. The statutes that have been declared unconstitutional by the Supreme Court of the United States and other courts are where it takes away the ability of the customer to negotiate a price in the national unitary market, and that is precise. Well, minimum wage laws do the same thing. A business might want to hire a 14-year-old for her first job and might want to pay her $6 an hour because that's what she's worth because she's 14 and it's her first job, and the state minimum wage laws prevent that. Absolutely, Your Honor. So there are all kinds of state health and welfare laws that impair the free market, right? The difference here is New Jersey is in effect imposing its minimum wage law on Pennsylvania. On Pennsylvania laborers, right? The only anti-discrimination angle I see here is that the law favors New Jersey workers over Pennsylvania workers who might want to work for a different price, but I don't see how it discriminates against Pennsylvania or out-of-state staffing companies or their clients, right? The action's all happening at the wage level, at the worker level, and they're not parties here. It is not simply the wages in this legislation, Your Honor. The regulatory scheme requires not just wages, and we can get to the benefits portion, but a whole host of information which must be supplied by the third-party client on workers who have nothing whatsoever to do with temporary laborers at all. Under this scheme, if a New Jersey staffing company or a Pennsylvania staffing company that does business in New Jersey wants to place temporary laborers in Pennsylvania, that's a Pennsylvania transaction. The third-party client is required to provide a host of information about employees having nothing whatsoever to do with that transaction. They are required to have a full comparator analysis based upon a whole host of factors which we submit under the proposed regulations are entirely contradictory and indecipherable. But placing that aside, it is wholly burdensome upon the market. I respectfully go back to Judge Ambrose initially. Is that different than the burdens that pork producers experienced in the Ross case? It's a different situation because in the pork producer's case, you had the pork going into the state of California. So California was essentially regulating the manner by which the pork was produced, and states traditionally have a much stronger role and a much stronger right to control what is sent to their market. This is outside. It wasn't just the pork going to California that was affected. It was all the pork being produced by those producers because they're not doing specific California pork. And the whole point was you're making this more expensive, more burdensome for us to just make pork, whether it's going to Alabama or California or wherever. That is correct. But the regulation at issue there had to do with the pork that would be coming into California. And because so much pork is consumed in California, basically the national market had to adjust accordingly. The parties harmed were out of state. That's why it was a decent dormant commerce clause challenge. Here, the parties being harmed, your clients, as found by the district court, are in state. Isn't it obvious that this legislation is a gift from New Jersey to staffing companies that are located outside of New Jersey and a great punishment to staffing companies that are located inside New Jersey? Isn't that obvious? In part, I agree, Judge Hardiman. It's a gift to out-of-state staffing companies. It is a severe burden to out-of-state customers. And the reason why it's a burden... How so? So if I owned a Pennsylvania manufacturing concern in Allentown, how does this New Jersey... And I have a history of employing 100 full-time regular workers, and every six months I employ another 200 temp workers. How does this legislation hurt me? You're no longer able to negotiate with the New Jersey staffing companies the way you might otherwise. I don't need to. I'm going to have a whole bunch of Pennsylvania staffing agencies to negotiate with right in my backyard because New Jersey just put out a business, an entire industry. New Jersey is essentially erecting a wall around the state of New Jersey for purposes of this business. Right, and the fear that you've articulated, perhaps persuasively, is the law of unintended consequences. They're doing this to, quote, help the temp workers, and all they're really going to do is put 110,000, I think that was the number, temp workers out of business because they're going to be unhirable. Or the state's gambit will pay off, and temp workers will continue to be hired, and they're going to get much better wages and benefits, et cetera. That's what the future has yet to tell us, right? I submit, Your Honor, that this is a discriminatory statute in another way. This law says a New Jersey worker is worth, on average, more. So, therefore, this law is saying if you want to hire, if you want to do any business in New Jersey, even a Pennsylvania staffing company doing business in New Jersey, if you want to hire a New Jersey resident as a temp worker within these classifications, you must pay them, on average, more. You are saying we are creating a wage that you are saying we must pay New Jersey workers more than Pennsylvania workers. It's a government-mandated wage rather than a market-driven wage, and so, too, with minimum wage laws. Minimum wage laws end at the state border, Your Honor. There's never been a statute in the history of this country, to my knowledge, which has permitted one state to export its minimum wage or manner of calculating this to say not our workers are worth more, and if you take a New Jersey worker, you must pay them more. My understanding is that Pennsylvania is a $7.25 minimum wage now, although it's going up potentially under legislation. New Jersey has a $15.13 minimum wage. If someone lives in Camden and they come to Philadelphia to work a minimum wage job, is Your Honor saying that New Jersey can tell that employer in Pennsylvania that he must pay him the New Jersey minimum wage? That's ridiculous. That doesn't happen. That's impossible because New Jersey's minimum wage cannot be exported or required to be imposed on another state. New Jersey here is requiring its not only wages and benefits and all of this scheme, it's imposing it out of state for the benefit of New Jersey employees. There's never been a statute ever that has ever done this, and it's completely egregious and inconsistent with those very statutes which say exactly, even the cases preceding the national court case, that you cannot interfere in the unitary national market. You cannot prohibit the negotiation in the free market. You cannot prevent the customers from the cost advantages that they may have. For example, Your Honor posited the Allentown manufacturer. That Allentown manufacturer may have a way to negotiate and to get its laborers and produce its laborers cheaper. You're saying to that employer or that co-employer, you cannot negotiate for New Jersey laborers, and that is improper. So the burden of the law falls the same on New Jersey staffing companies as it does on Pennsylvania staffing companies, right? It does not, Your Honor, because New Pennsylvania staffing companies have the additional burden of having to treat workers differently, having to comply with two different states' legislation, and they have to be able to tell, they have to deal with their own permanent employees, and frankly, their temporary employees, and say New Jersey temporary employees have to be paid on average more than you, notwithstanding your seniority. And the New Jersey staffing companies have to do that same thing, right? If this law stopped at the border of New Jersey and simply said, this applies solely to the state of New Jersey for New Jersey staffing companies, for New Jersey employees, for New Jersey third-party clients, and it ends at the border, I would not have a dormant commerce claim. I might have other claims, which at the appropriate time, I'd like to get to onto the vagueness and police power, but I would not have a dormant commerce clause. This, however, is dealing with infringement upon the national market for wages, something that's never been done, and defendants have not cited a single statute anywhere that's even analogous that's been permissible. Let me just work through this. You tell me if it's wrong. It seems to me that the law requires the same from New Jersey staffing companies as it does from Pennsylvania staffing companies. It requires the same burden. It imposes the same burden on New Jersey clients who would retain these temps as it does on Pennsylvania clients who would hire these temps. The only group of people who are treated differently are the employees themselves, the temps themselves. Is that incorrect? In a sense it's incorrect, and I'll give an example. In the Baldwin case, which is the leading case that was struck down. Let me interrupt you because Judge Porter's question had nothing to do with the Baldwin case. He gave you facts. Are those facts, as he just outlined, correct or incorrect? New Jersey employees sent to Pennsylvania, for example, have to be treated differently than Pennsylvania employees sent from a New Jersey staffing company. But otherwise, the burdens are the same in that the statutory regulation, if applied in Pennsylvania, Your Honor is correct, that the regulations are the regulations. But if I might, in the other cases having to do with pricing discrimination that have been struck down, the regulations there apply equally to, if you have price affirmation or price setting, they apply equally to in-state and out-of-state as well. That doesn't salvage those statutes. If you say to, if a New York presents a law that says you cannot sell a bottle of scotch for more than $20 or less than $20, and that applies to both in-state and out-of-state, you're still dictating the out-of-state pricing to a Vermont seller of scotch, which is impermissible as established by the court. And I apologize for not answering the question originally. I'm going to ask a factual question here. You say that a New Jersey employee put out by a staffing agency is to be paid in Pennsylvania more than a Pennsylvania employee affiliated with that staffing agency. Is that correct? That's correct. The reason I say that, Judge Ambrose, is because under the statute, and particularly under the regulations, if I might go to, it's at addendum page 45, Your Honor, that the chapter is applicable to each temporary laborer, and I won't go through the entire definition, who has been assigned by the temporary health service firm to work in a designated classification outside of New Jersey, but who has his or her primary residence in New Jersey. So hypothetically, a Pennsylvania company, which does business in New Jersey and is thereby covered by this law, sends to Pennsylvania, client in Allentown, a New Jersey resident and a Pennsylvania resident. That New Jersey resident must be paid on no less than the average of the New Jersey worker and also discriminates against the national market and against Pennsylvania interests. Thank you, Mr. Sinage. We'll hear you on rebuttal. Let's hear Mr. Levy's argument. May it please the Court. This Court should affirm the decision below because precedent squarely forecloses appellant's claims on the merits, and their facial challenges to New Jersey's law cannot succeed. Just at the outset, have you found any cases upholding a state law that applies to companies physically working outside the state? Yes, Your Honor, there are some. So for instance, we cite the Ward case out of the Ninth Circuit in 2021, which involved a California law that required United Airlines, whose employees, of course, operate across state lines to comply with certain wage disclosure requirements on their, on employees that were primarily based in California. Pro sports have similar rules, right? Where a player who's based in, say, Florida where there's no, I don't remember if there's no income tax. I think there's no income tax there, but when they go play a game in Philadelphia or Pittsburgh, they have to pay income taxes to that jurisdiction, right? I'm not exactly sure how the intersection of tax law and those sports leagues are involved, but if I may, to bring it home to I think the core questions underlying the Dormant Commerce Clause challenge. So I think the first and most important point is that National Pork squarely resolves this Dormant Commerce Clause claim. National Pork is the starting and ending point. I think from my friend, we didn't hear much about the details of that decision because that filed the case, this case before that case was decided, right? I believe sued might have been filed a week after the issuance of decision, but if I'm incorrect about that briefing, certainly followed the issuance of National Parks decision. When you first propose a law like this, let's say, there's an element that appears to be counterintuitive. I'm a Delaware employer and I'm using this staffing agency, which I've used for years and they're sending somebody right across the river to from New Jersey to Delaware. And they're now telling me I've got to give them more benefits and pay them more in wages. Despite the fact I've been, there's no such law in Delaware and I've been dealing with this staffing agency for years. If you're a Delaware employer, it sounds like it doesn't seem fair, does it? I don't view it that way, Your Honor. And I spare it maybe to the employees, but to the employer who said, wait a minute, wait a minute. I've got to now pay more in salary, more in benefits than what I heretofore paid because of a New Jersey law. So here's the fundamental point, Your Honor, regardless of, you know, how reasonable minds may differ about the fairness or equities, the policy of the law, as Judge Porter rightly noted. And as the district court found repeatedly in the decision below the burdens imposed by this law are imposed even handedly on all irrelevant stakeholders. So there is no discrimination between New Jersey and out-of-state staffing firms. There is no discrimination between the third-party clients in state versus out-of-state. I get it. But I'm asking you to look at this from the perspective of the Delaware employer. Yes, Your Honor. So as to the question, you know, in response to the questions of the group. The answer is it's really bad for the Delaware employer and too bad. Right. And so we're preferencing workers over employers. That's what the law does. Why dance around it? That's certainly a fair characterization of the effects of this law. And it might work. And it's simple and direct. Either this law is going to raise the salaries and benefits of over 100,000 New Jersey temporary workers or it's going to put them out of, deprive them of work. Right. Those are plausible effects of the law. And just to bring this back. And none of that has anything to do with whether it's okay under the Dormant Commerce Clause. The reason it's okay under the Dormant Commerce Clause is that a good Dormant Commerce Clause argument is that a state passes protectionist legislation that favors its in-state businesses and hurts out-of-state businesses. And this law does the exact opposite. This law hurts in-state business and helps out-of-state business. Right. I couldn't agree more on what the Dormant Commerce Clause is about. And I would just say that as to the question about a Delaware third-party client business, it's important to, I think, compare how that business is situated under this law to how the pork producers in Iowa were situated vis-a-vis the California law. Those individual pork producers may not even have wanted to produce pork that made its way into California. They simply had no control about where their products ended up in the national marketplace. Here, if that Delaware third-party client says, I don't want to pay the prices that New Jersey staffing firms are charging for New Jersey temp workers' labor, then they can simply avail themselves of a different labor market. They can simply choose not to avail themselves of the New Jersey market. Let's police the boundaries of New Jersey's power here. What about Mr. Sinan's argument about the employee from Camden who comes across the bridge to work in Philadelphia? Could New Jersey pass a law requiring the Philadelphia business to pay the New Jersey minimum wage to that person? Yes, New Jersey could do that. At least there would be no Dormant Commerce Clause infirmity because there would be no discrimination of the kinds we've been talking about. But if I can backtrack a moment, I just want to clarify a very important point. Well, before you move on, though, I want to challenge you on that because it seems counterintuitive. It seems counterintuitive that New Jersey could pass a law that requires, to go back to what you said before, United Airlines. Let's say there's a United Airlines flight attendant from Newark. He lives in Newark. He's a lifelong resident of Newark. And he flies all over the country for United Airlines. Could California pass a law requiring that any time a United flight on which he works goes to California that that flight attendant is paid three times the wage that he gets when he's in New Jersey? So the problem with that sort of, that regulation as applied to that particular problem probably has much more to do with due process, personal jurisdiction and the minimum contacts required between the regulating state and the transaction than it does with Dormant Commerce. Right, and that's why I picked California. It's very far away. But why is the jurisdictional and minimum contacts evaluation different when it's Pennsylvania rather than California? Is it because it's a short walk across the bridge, or I don't understand why it would be different? So minimum contacts analyses, which of course only pertain to due process, which is not the challenge here, as Your Honor understands. But I mean, they're necessarily fact sensitive in some ways. And if New Jersey was regulating the, you know, wages charged by a New Jersey worker for their labor, but that worker actually has, you know, tremendous contacts with New Jersey. They just cross the Ben Franklin Bridge every single day. I mean, I think the minimum contacts due process, personal jurisdiction analysis might be different than in the California Newark example. I want to make two particular points, one on the law, and then one on the facts and coverage of the statute. So on the law, I do think it's important to take stock of what's left of the Dormant Commerce clause, what the heart of it is after National Pork. One is discrimination, and we've spoken a bit about discrimination. Of course, you know, the court and the other opinions do recognize that where some laws involve instrumentalities of commerce, which aren't involved here, that might raise Dormant Commerce clause questions. There's also, of course, Edgar, the one remaining fact pattern where there, you know, was it a regulation by Illinois of transactions that occurred wholly out of state? And the plurality said in Edgar, you know, that's sort of a problem under the Dormant Commerce clause. The majority in that decision said it doesn't satisfy Pike. So I think, you know, Edgar or instrumentalities of commerce would be the only kinds of ways in which the Dormant Commerce clause might come into play. It's really Dormant Commerce clause, or is it extra territoriality? In other words, when can a state impose on an employer in another state to abide by certain regulations of the first state, this case, New Jersey. So, I mean, forget Dormant Commerce clause for the moment. Isn't it really about extra territoriality, state relations? So the way that our, as Justice Gorsuch explained, I think, in National Park, the way that the constitution polices horizontal separation of powers is through a few different ways. The Dormant Commerce clause is one due process, full faith and credit are the others. Here we're only dealing with the Dormant Commerce clause claim, and there is no per se or even an almost per se rule against extra territoriality under the Dormant Commerce clause. Chief Justice Roberts' concurrence made that very clear. And that pipe balancing still exists. But what would, my question to you is, is this really a Dormant Commerce clause case, or is it a case of some other type of area of law, whereby one state can tell people in another state what they must do? So I don't think this case raises any hard questions about any of, you know, about the kind of. But I'm just saying what's the, under what rubric do we, should we examine the issue? I think this court should examine the issue under the Dormant Commerce clause, because that's. If we stick with the Dormant Commerce clause, why, in a sense, why isn't this case just like Healy, Brown, Foreman, and Baldwin? They're the prices being regulated were for what beer, milk, and liquor. Here are the prices being set are for labor. I mean, it's just a price discrimination. The same as those cases, different commodity. So this case is not analogous or even similar to those kinds of price fixing regulations. I am not. So National Park quotes Walsh, the Supreme Court's 2003 decision that I think frames what those cases are about really nicely. It says there's a specific kind of discriminatory price regulation going on in those three cases, which quote ties the price of in-state products to out-of-state prices. There's a dynamic correspondence in each of those three cases between prices that an interstate actor can charge in one state and the prices they can charge in another state, even when they're not availing themselves of the first state's market. So here in New Jersey is in no way saying if a Pennsylvania staffing firm is not seeking to avail itself of New Jersey's temporary labor market, likewise for a Pennsylvania business, we nonetheless are setting the prices for those transactions. It's not a floating currency model like that. And in response to the helpful rubric you outlined when my friend was up at the podium, Judge Porter, the scope, and I think this is important, the scope of our law as we read it is actually narrower than what you posited. So the law does not apply to the employment by Pennsylvania staffing firms of New Jersey temporary workers. Covered staffing firms under our statute are those that operate, are located, or transact business in New Jersey, but also per the definitional section of the law, and as indicated in Section 8A, are also complying with New Jersey workers' comp and UI. So the covered employees, yes, I mean the covered firms, excuse me, are doing business in New Jersey, but if they're not, but they also must be paying into complying with other New Jersey employment laws. So it's not accurate in our view to say that whenever a Pennsylvania staffing firm, those transactions are. I suggested to Mr. Sinens that the law applies the same and imposes the same burdens on New Jersey staffing companies and out-of-state staffing companies. It imposes the same burdens on New Jersey clients who would use those staffing companies as out-of-state staffing companies. He said, no, not exactly, because I don't remember exactly how he explained it, but he suggested that it might not apply the same to a Pennsylvania staffing company. So the way we read our law is that there is no, New Jersey is not regulating Pennsylvania staffing firms whatsoever. We're regulating New Jersey staffing firms, by which I mean, those that are located, operated, or do business in New Jersey and are complying with New Jersey workers comp UI laws with respect to their employees who are the temporary workers. Isn't it more than that? You're also regulating New Jersey workers who go work in Pennsylvania for Pennsylvania staffing firms. Only when placed, only when, so only when placed by New Jersey staffing firms as defined by the law. Oh, so if a Philadelphia staffing firm hires a worker from Camden and to come work in Philadelphia, the law doesn't apply to that person. If that Philadelphia firm is paying UI and workers comp into the PA systems for that employee, then that transaction is not covered. So all you might be doing here is moving all these New Jersey firms across the river. It's one potential consequence, and that doesn't rise to the level of a dormant common-clause violation. Could you quickly address the proposed regulations? That troubles me, that the notion that the state can say, well, this law is not too vague because we are working on some regulations. Working on regulations wouldn't give me a lot of comfort if I were a business that's going to be regulated by the state here. I don't know what they say. I don't know whether my business is destroyed, harmed, or unaffected at all until I actually read the regulations. Is there any case support for the notion that impending or proposed regulations could matter in a case like this? I'm not aware of any particular case saying that forthcoming regulations are the difference maker, but our position, to be clear, is not that the proposed regulations are necessary. As we put it with a particular phrase in our brief there, icing on a cake that's already been frosted. We think that the statute standing on its own is more than comprehensible and clearly provides much more guidance than being no rule or no standard at all. All right. And that, let's assume we agree with you on that. It's also the case then that when the regulations are issued, I'm not saying you're going to do this. The state's going to do this. But there's a chance that when the regulations are issued, they're really, really bad, inconsistent with the statute. I assume your answer is these plaintiffs in this case could challenge those regulations at the appropriate time to the extent they were inconsistent with the statute or vague, et cetera. That is my answer, Your Honor. I think if they believed there were an ultra vires issue, then that would be a state law administrative matter to play out in state court litigation. All right. Thank you very much, Mr. Levy. Let's hear the rebuttal. If it pleases the court, I'd like to address Judge Hardiman's comment earlier, where essentially you're saying normally the dominant commerce clause deals with situations where you are looking to favor in-state companies as opposed to out-of-state companies. And here it turns it on its head because essentially they are really adversely affecting in-state companies. I would respectfully submit that the dominant commerce clause is much broader than that. And here it also incorporates attempts to benefit in-state interests to the detriment of out-of-state interests. So here the New Jersey legislation explicitly benefits New Jersey employees to the detriment of out-of-state employees. But it seems like in one case it's, you know, most of the few dormant commerce clause cases that we have that have been successful, it's a race to the bottom. Here it's a race or ascendancy to the top. In other words, benefits are higher. That is true for only New Jersey workers but not others. Why does New Jersey have an interest in protecting workers' rights in Pennsylvania? Because perhaps they would be, let's say New Jersey changes its definition of residency, which they have in the statute. And they say we want to be the location that protects workers the most nationwide. Therefore, we want to expand the protections. Your Honor had indicated before, well, they could impose this in other states. What if New Jersey said in its statute, anybody who is a New Jersey resident gets the benefits of all of our rights, wherever they work, in the entire country. And, therefore, they try to export their wage scale throughout the country. It seems like an absurd example. But if I heard my friend state before to Your Honor's question, he believes the state of New Jersey has the ability to export its minimum wage to Pennsylvania. So I don't think that's appropriate. And I think that under the national court decision, as Your Honor posited, and the issue there, and I'm quoting from Justice Gorsuch's opinion for the court, I don't know if it's a quote actually or maybe a summary, but essentially the impermissible extratorial effects in those cases, and those were the three cases we had discussed earlier, presents cases where it prevents out-of-state firms from undertaking competitive pricing and depriving businesses or consumers of whatever competitive advantages they may possess. They address price control or pricing affirmation statutes that tie the price of in-state products to out-of-state prices, which is exactly what's doing here. As Judge Porter had indicated, the in-state labor is now being exported out-of-state. It's the same. This very language survives nationally. Who's the party aggrieved? The party. Who's the party? In most of the Commerce Clause cases, the party aggrieved is the out-of-state party, right? Our clients represent. They're bringing the case. Yes, our clients have members who do business with out-of-state entities, and that's in the record, and by virtue of that, they are experiencing the harm because of the out-of-state, not just resistance, but complete. Well, the Allentown manufacturer wants to bring a case. I suppose they could, but I don't know why the quick answer wouldn't be that they ought to just hire Pennsylvania residents. They don't have to hire New Jersey residents. I don't know why they would hire New Jersey temporary workers when they could hire Pennsylvania temporary workers. If they could get labor at half the cost of what they're getting from New Jersey labor. That may be the practical business solution, but it doesn't salvage an unconstitutional statute from New Jersey which attempts to export its pricing and wage across state lines. Thank you. Thank you. We'd like a transcript of this argument as well. Thank you. Thank you.